**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| James Krusenoski | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23 C 1772 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| LTF Club Operations Company, Inc., and | ) | |
| Technogym USA Corp., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff was injured while riding an exercise bicycle at one of Defendant LTF's fitness clubs. Defendant Technogym manufactured the bicycle, and the claims against Technogym have been dismissed for lack of personal jurisdiction. Defendant LTF moves for summary judgment on the remaining claims. For the reasons stated below, Defendant LTF's motion is granted in part and denied in part.

**Legal Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[S]peculation is not enough to create a genuine issue of fact for the purposes of summary judgment." *Tousis v. Billiot*, 84 F.4th 692, 696 (7th Cir. 2023) (citations omitted). Rather, the parties must support their arguments by citing particular parts of the record. *Horton*, 883 F.3d at 948. The Court views the facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.*

**Background**

Defendant LTF operates fitness clubs, including a club in Burr Ridge, Illinois. R. 138 ¶ 1. On July 26, 2022, Plaintiff was injured when the seat of an exercise bicycle (the "Subject Bicycle") collapsed under Plaintiff without warning, causing him to fall backwards and land on his left wrist and hip. *Id.* The Subject Bicycle had been installed by LTF for use at the Burr Ridge fitness club around 2019. *Id.* ¶ 13. The Subject Bicycle had been designed and manufactured by Technogym. *See* R. 119 ¶¶ 6–8.

To ensure that its exercise equipment is safe for use, LTF has a preventative maintenance program that requires monthly and semi-annual inspections of all fitness equipment, including the Subject Bicycle. R. 138 ¶¶ 14–16. The requirements of the monthly inspection are summarized in a two-page document that instructs technicians to "verify seats can adjust smoothly and does not stick or slip." *Id.* ¶ 15. The requirements of the semi-annual inspection are summarized in a three-page document that instructs technicians to take certain components off of each bicycle to look inside. *Id.* ¶ 16. LTF members are also able to report maintenance issues. R. 119 ¶ 11.

On June 8, 2022, LTF trainer Erik Callaghan made an entry on the work order history for the Subject Bicycle which reads: "Repair / Bike seat does not lock anymore. Member was on the bike and the seat just dropped all the way down to the lowest setting." R. 138 ¶ 4. Following this report, on June 20, LTF's facility technician Tom Sutte inspected and tested the Subject Bicycle and concluded that it was safe to ride and to leave on the gym floor for future use. *Id.* ¶ 8. He rode the Subject Bicycle and beat on the seat, but he did not look inside. R. 113-4 at 21.

On June 30, 2022, the Subject Bicycle was due for semi-annual preventative maintenance. R. 138 ¶ 20. During his deposition, Sutte testified that he had marked the maintenance as complete on LTF's tracking spreadsheet as of July 28, 2022. *Id.* The spreadsheet was not specific to the

2

Subject Bicycle but applied to all exercise bicycles at LTF's facility that were the same design as the Subject Bicycle. *Id.* Sutte testified that it was "possible [he had] completed the work [on the Subject Bicycle] prior to [July 28]" even though he "did not mark it as complete until [July 28]." *Id.* In other words, it remains a dispute of fact as to whether LTF completed the semi-annual preventative maintenance on Subject Bicycle prior to Plaintiff's injury on July 26. *Id.*

Plaintiff filed this lawsuit following his injury and in March 2024, the parties inspected the Subject Bicycle. *Id.* ¶ 21. During the inspection, the seat locking mechanism failed because there was a missing sleeve in the seat assembly. *Id.* ¶ 22. Technogym employee Dean Martin opined that the missing sleeve had been properly installed at some previous point in time but had gone missing. *Id.* ¶ 23. The parties agree that the Subject Bicycle was dangerous for use without the missing sleeve because seat was "at a high risk of failing." *Id.* ¶¶ 24–26. A user of the Subject Bicycle, without taking off any coverings, would not be able to tell that the sleeve was missing. *Id.* ¶ 27. But during an inspection of the Subject Bicycle, if a technician attempted to lubricate the sleeve, the technician would be able to see that the sleeve was missing. *Id.* ¶ 29. While the Technogym's 2021 maintenance checklist calls for lubrication of the sleeve, LTF's semi-annual inspection document does not call for the lubrication of the sleeve. *Id.* ¶¶ 18–19.

During her deposition, Technogym's expert Anne Mathias testified that the Subject Bicycle had been disassembled, and it is likely that the sleeve had been removed prior to the incident on June 8, 2022. R. 118-14 at 12. Mathias further testified that without the sleeve and related hardware, the Subject Bicycle was "no longer reasonably safe because it was no longer as designed." *Id.* at 12. LTF's expert Dan Thompson testified during his deposition that "failure to ensure that the seat sleeve and related hardware were installed in the [Subject Bicycle] was a conscious disregard for future users of that bike." R. 138 ¶ 30. Thompson further testified that, "if

3

it was missing, the [sleeve] and related hardware when it was being used by [Plaintiff] presented an unreasonably dangerous risk to [Plaintiff]." *Id.* ¶ 32. Thompson further testified that if he were a technician who was responding to the June 8 report of a collapsed seat, he would have checked "the technical manual for that piece of equipment." R. 118-15 at 12.

As also relevant, Plaintiff became a member of LTF's fitness clubs in 2007 when he signed the Member Usage Agreement ("MUA"). R. 119 ¶ 1. The MUA contains an "Assumption of Risk" section which states as follows:

> I understand that there is an inherent risk of injury . . . in the use of equipment and services at a Life Time Fitness center[.] . . . This includes, but is not limited to . . . cardiovascular and resistance training equipment . . . [and includes] injuries arising from the use of any of Life Time Fitness centers or equipment, . . . including, but not limited to heart attacks, strokes, heart stress, sprains, broken bones and torn muscles or ligaments.

R. 113-1. The MUA also contains a "Release of Liability" section in which Plaintiff agreed to "waive any and all claims or actions that may arise against [LTF]" including "personal, bodily or mental injury, economic loss or any damage . . . resulting from the negligence of [LTF]." *Id.* Together, these sections constitute an "Exculpatory Provision" under which Plaintiff agreed to waive claims of negligence against LTF.

In sum, Plaintiff brings four counts against LTF including two claims for negligence (Count II for negligence and Count IV for product liability negligence), a claim for strict product liability (Count III), and a claim for willful and wanton conduct (Count I). R. 46. LTF moves for summary judgment on all counts. R. 111.

**Discussion**

## I.   Waiver of Negligence Claims

Illinois courts allow parties "to contract away liability for their own negligence" through exculpatory clauses. *Cox v. U.S. Fitness, LLC*, 2013 IL App (1st) 122442, ¶ 14. Such clauses are valid and enforceable unless: "(1) there is a substantial disparity in the bargaining position of the two parties; (2) to uphold the exculpatory clause would be violative of public policy; or (3) there is something in the social relationship between the two parties that would militate against upholding the clause." *Garrison v. Combined Fitness Centre, Ltd.*, 559 N.E.2d 187, 189–90 (Ill. App. Ct. 1990). In addition, for an exculpatory clause to be enforceable, it must "contain clear, explicit, and unequivocal language referencing the types of activities, circumstances, or situations that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Id.* at 190. "In this way the plaintiff will be put on notice of the range of dangers for which he assumes the risk of injury." *Id.* "The precise occurrence which results in injury need not have been contemplated by the parties at the time the contract was entered into." *Id.* "The injury must only fall within the scope of possible dangers ordinarily accompanying the activity and, therefore, reasonably contemplated by the parties." *Cox*, 2013 IL App (1st) 122442, ¶ 14 (citations omitted). "The relevant inquiry is not whether plaintiff foresaw defendants' exact act of negligence, but whether plaintiff knew or should have known the accident was a risk encompassed by his release." *Id.* (citations omitted).

Plaintiff does not argue that the Exculpatory Provision is the result of substantial disparity between the parties, a violation of public policy, or that anything in the relationship of the parties militates against upholding the Provision. *See* R. 120 at 9–13. Presumably, Plaintiff did not raise these arguments because, as to exculpatory clauses entered into between fitness centers and their

members, such arguments to invalidate these clauses have been previously rejected by Illinois courts. *See, e.g., Garrison*, 559 N.E.2d 187; *Owen v. Vic Tanny's Enterprises*, 199 N.E.2d 280 (Ill. App. Ct. 1964).

Plaintiff does argue, however, that the Exculpatory Provision should not apply because it did not "reasonably contemplate [a] mechanism of injury" resulting from defective exercise equipment. R. 120 at 9. To support this position, Plaintiff cites cases where courts have found that certain injuries at fitness centers were outside the scope of the exculpatory clauses. *See Hawkins v. Cap. Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 25 (injury caused by a failing mirror was outside the scope of exculpatory clause); *Offord v. Fitness Int'l, LLC*, 2015 IL App (1st) 150879, ¶ 22 (injury caused by slipping on a basketball court due to water from a leaking rook was outside the scope of exculpatory clause); *Locke v. Life Time Fitness, Inc.*, 20 F. Supp. 3d 669, 673–75 (N.D. Ill. 2014) (injury caused by inadequate training of fitness center staff to respond to medical emergency was outside the scope of exculpatory clause). But these cases are all distinguishable because they involved injuries that were unrelated to the exercise equipment.

As stated above, the issue is whether the injury fell within the scope of possible dangers ordinarily accompanying Plaintiff's activity. In the MUA, Plaintiff signed an assumption of risk that accepted an inherent risk in the use of cardiovascular training equipment, and the Court finds that a defective exercise bicycle is within the scope of possible dangers ordinarily accompanying such use. This finding is consistent with rulings made by Illinois Appellate Courts regarding similar exculpatory clauses between fitness centers and their members. *See, e.g., Cox*, 2013 IL App (1st) 122442, ¶ 18 (explaining that "the release includes injuries caused by equipment" where plaintiff's injury was caused by an employee who negligently set up the equipment)*; Neumann v. Gloria Marshall Figure Salon*, 500 N.E.2d 1011, 1012–13 (Ill. App. Ct. 1986) (explaining that the

"plaintiff could reasonably contemplate that she assumed the risk of injury resulting from use of the machines provided by defendant" where plaintiff injured herself on a resistance machine after an employee set up the machine in the wrong position); *Keevil v. Life Time Fitness, Inc.*, 2016 IL App (1st) 151551-U, ¶¶ 4, 52 (citations omitted) (explaining that "the risk of unsafe equipment . . . can be contemplated by a participant" and the exculpatory clause was "broad enough to cover" a situation where plaintiff was injured after an exercise resistance band broke and hit his eye).

Because Plaintiff's injury was within the scope of the Exculpatory Provision, the Court finds that Plaintiff waived his negligence claims. The Court thus grants LTF's motion for summary judgement regarding Counts II and IV. Although Plaintiff waived his negligence claims under the Exculpatory Provision, Plaintiff did not waive his claims for strict product liability or for willful and wanton conduct. *See Munoz v. Nucor Steel Kankakee, Inc.*, 44 F.4th 595, 603 (7th Cir. 2022) (explaining that "an exculpatory clause will not bar claims for injuries" from willful and wanton conduct). As such, the Court addresses these other claims below.

## II.    Strict Product Liability

Illinois law requires the following elements for strict product liability: "(1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition." *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 855 (N.D. Ill. 2017) (citations omitted). "[A]ll entities in the distributive chain of an allegedly defective product, including manufacturers, sellers, wholesalers, distributors and lessors of the product, are strictly liable . . . for injuries resulting from that product." *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 887 N.E.2d 569, 574 (Ill. App. Ct. 2008). "This liability is predicated on a finding that the product is unreasonably dangerous, regardless of fault." *Id.*

There are two issues with Plaintiff's claim for strict product liability. First, it is unclear whether LTF is part of the "distributive chain" of the Subject Bicycle. Under Illinois law, the "general rule is that strict product liability does not extend to services." *D'Ambrosio v. Rajala*, 783 F. Supp. 3d 1077, 1099 (N.D. Ill. 2025) (citations omitted). Rather, it extends to products and a "product is tangible personal property distributed commercially for use or consumption." *Id.* (citations omitted). Here, LTF is a fitness center that provides exercise equipment as part of its membership services. LTF is thus primarily engaged in providing fitness services rather than selling or distributing exercise equipment.

But second, even assuming that LTF were part of the distributive chain, this case does not involve a manufacturing or design defect. The only evidence regarding this issue comes from Technogym employee Dean Martin who opined that the missing sleeve had been properly installed in the initial manufacturing of the Subject Bicycle. There is no allegation, evidence, or argument that the Subject Bicycle was unreasonably dangerous as a result of its manufacturing or design. To the contrary, the issue is whether LTF sufficiently inspected the Subject Bicycle before deeming the Bicycle safe for use by its members. The claim turns on fault rather than design and thus, fundamentally, this is a question of negligence rather than strict product liability. The Court thus grants LTF's motion for summary judgement regarding Count III.

## III.    Willful and Wanton Conduct

Willful and wanton conduct "is regarded as an aggravated form of negligence" rather than as a separate tort. *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 19. To recover damages based on willful and wanton conduct, "a plaintiff must plead and prove the basic elements of a negligence claim—that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury."

*Id.* In addition, a plaintiff must prove "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Id.* Here, LTF does not argue for the purpose of summary judgment that Plaintiff can show the basic elements of negligence. *See* R. 112 at 11–15. And Plaintiff does not contend that LTF acted with deliberate intention to harm him. *See* R. 120 at 6–9. As such, the critical question is whether LTF showed a "conscious disregard" for Plaintiff's welfare.

As relevant to establish conscious disregard, the "Illinois Supreme Court has provided two examples of reckless willful and wanton conduct: (1) a failure, after knowledge of impending danger, to exercise ordinary care, or (2) a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *Munoz*, 44 F.4th at 603. Critically, "[w]hether conduct amounts to willful and wanton negligence is generally a question of fact for the jury to determine." *Oelze v. Score Sports Venture, LLC*, 927 N.E.2d 137, 149 (Ill. App. Ct. 2010).

Here, the facts are a close call. On June 8, 2022, LTF became aware of a seat issue regarding the Subject Bicycle. In response, LTF technician Tom Sutte inspected the Bicycle and determined that it was safe. On one hand, a reasonable jury could find that LTF exercised ordinary care when Sutte inspected the Bicycle. But on the other hand, it remains a dispute of fact whether LTF completed its semi-annual preventative maintenance inspection of Subject Bicycle prior to Plaintiff's injury on July 26 and, viewing the facts in the light most favorable to Plaintiff, the Court must find for the purpose of summary judgment that LTF failed to complete an in-depth inspection of the Subject Bicycle (where it took components off the Bicycle to look inside) between June 8 and Plaintiff's injury on July 26. A reasonable jury could thus find that LTF became aware of impending danger on June 8 and then failed to exercise ordinary care because it failed to complete an in-depth inspection of the Subject Bicycle prior to July 26. As LTF's expert testified, if he were

9

a technician who was responding to the June 8 report of a collapsed seat, he would have checked "the technical manual for that piece of equipment." R. 118-15 at 12. As stated above, Technogym's maintenance checklist calls for lubrication of the sleeve, and during an in-depth inspection, a technician would realize that the sleeve was missing and that Subject Bicycle—as LTF's expert put it—"presented an unreasonably dangerous risk to [Plaintiff]." R. 138 ¶ 32.

Given the above, viewing the facts and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court finds that a reasonable jury could return a verdict for Plaintiff on this issue. For this reason, LTF's motion for summary judgment is denied regarding Count I.

## Conclusion

For the reasons stated above, Defendant LTF's motion [111] for summary judgment is granted in part and denied in part. Plaintiff may proceed on its claim for willful and wanton conduct under Count I. The parties shall file a joint status report by 4/16/26, setting forth the following: A) whether, in light of the Court's ruling, the parties wish to engage in settlement discussions prior to trial; and B) the anticipated length of the trial.

SO ORDERED.

ENTERED: April 8, 2026

**HON. JORGE L. ALONSO**
**United States District Judge**

10